The UTAH ENVIRONMENTAL CONGRESS, and Forest Guardians, Plaintiffs,

v.

Elaine J. ZIEROTH, in her official capacity as Forest Supervisor, Manti–La Sal National Forest; Dale Bosworth, in his official capacity as Chief of the U.S. Forest Service, Defendants.

Case No. 2:01CV217K.

United States District Court,
D. Utah,
Central Division.

March 13, 2002.

---

Jack M. Morgan, Troy A. Barsky, Manning Curtis Bradshaw & Bednar LLC, Salt Lake City, UT, Bernard Zaleha, Boise, ID, Ray Vaughan, Montgomery, AL, for Plaintiffs.

Stephen L. Roth, U.S. Attorney's Office, John K. Mangum, Salt Lake City, UT, for Defendants.

Steven C. Tycksen, B. Ray Zoll & Tycksen LC, Salt Lake City, UT, for Intervenor–Defendant.

## MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge.

This matter is before the court on Plaintiffs Utah Environmental Congress' and Forest Guardians' Petition for Review of Agency Action seeking judicial review of the Forest Service's May 22, 2000 Record of Decision with respect to the South Manti Timber Salvage Project. Plaintiffs' petition is brought pursuant to Federal Rule of Appellate Procedure 15 and *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560,

1580 (10th Cir.1994). The court held a hearing on Plaintiffs' Petition on January 24, 2002. Plaintiffs were represented by Ray Vaughan, Defendants were represented by John Mangum, and Intervenor Defendants were represented by Steven C. Tycksen. Having fully considered the petition, memoranda, and declarations submitted by the parties, the administrative record, and the facts and law relevant to this petition, the court enters the following Order.

## BACKGROUND

This petition for review is an appeal of the Forest Service's approval of a timber salvage project in the Manti–La Sal Forest known as the South Manti Timber Salvage Project ("the Project"). The project provides for the sale and harvesting of a portion of the dead Engelmann spruce trees killed by a spruce beetle epidemic in the forest. The stated purpose of the project is to reduce the potential of future wildfires due to the amount of dead timber. The government issued all of the required documents for the project—an environmental assessment, draft environmental impact statement, and final environmental impact statement—and conducted information and comment sessions on each.

In accordance with agency procedures, Plaintiffs filed written objections and sought an appeal within the agency. The agency considered their objections and affirmed the Forest Service's decision. Plaintiffs filed a petition for review of the agency action in this court pursuant to the Administrative Procedures Act (the "APA"), 5 U.S.C. §§ 701–06.

Plaintiffs allege violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4371 et seq., and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–14. Specifically, Plaintiffs claim that the Forest Service acted arbitrarily, capriciously, and contrary to law by: 1) failing to monitor for Management Indicator Species (MIS) as required by law, regulations and the Forest Management Plan; 2) failing to establish a valid purpose and need for the project, and 3) failing to respond to comments submitted by the EPA as required by law. Therefore, Plaintiffs are seeking to have the May 22, 2000 Record of Decision by the Forest Service reversed and are requesting that any further action under that decision be enjoined until the Defendants can demonstrate compliance with the applicable laws.

## DISCUSSION

### Standard of Review

■ This court reviews claims that the Forest Service violated either NEPA or NFMA under the APA. Under Section 706 of the APA, this court must determine, based on the record before the Forest Service, whether the Rule of Decision ("ROD") and Final Environmental Impact Statement ("FEIS") issued for the Project are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ In applying the arbitrary and capricious standard, this court must determine whether the "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This court cannot substitute its own judgment for that of the Forest Service. *Id.* The court considers an agency decision arbitrary and capricious if "the agency ... relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Friends of the Bow v. Thompson,* 124 F.3d 1210, 1215 (10th Cir.1997) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

██ In reviewing the adequacy of an environmental impact statement, courts are only to ensure that the required process was followed. "The requirements of NEPA ... apply to procedure and do not undertake to control decision making." *Environmental Defense Fund v. Andrus,* 619 F.2d 1368, 1374 (10th Cir.1980). "Once an agency has made a decision subject to [NEPA]'s procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of action to be taken.'" *Stryker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). Under Tenth Circuit law, the role of the court "is limited to a determination of whether the statement is a 'good faith, objective, and reasonable' presentation of the subject areas mandated by NEPA." *Sierra Club v. Stamm,* 507 F.2d 788, 793 (10th Cir.1974).

## A. Monitoring Obligations under the NFMA

Plaintiffs argue that the Forest Service violated NFMA, NFMA's implementing regulations, and the Forest Plan by approving the Project in the absence of adequate management indicator species population data for the blue grouse.

NFMA directs the Forest Service to manage each National Forest under principles of "multiple-use" and "sustained yield." *See* 16 U.S.C. § 1604. The For-

est Service's management of the national forests occurs at two levels. *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 1668–69, 140 L.Ed.2d 921 (1998). "At the first level, the Forest Service develops the Forest Plan, a broad, programmatic document, accompanied by an environmental impact statement and public review process conducted in accordance with [NEPA]." *Colorado Environmental Coalition v. Dombeck,* 185 F.3d 1162, 1167–68 (10th Cir.1999); 42 U.S.C. § 4331 et seq.; see also 16 U.S.C. § 1604(d); 36 C.F.R. § 219.10(b). The Forest Plan must incorporate multiple forest uses, and thus coordinate the management of "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). The Forest Plan must also "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." *Id.* at § 1604(g)(3)(B).

At the second level, the Forest Service implements the Forest Plan by approving particular projects, such as the Project at issue in this case. Each project is subject to further NEPA review and must be consistent with the Forest Plan. *Dombeck,* 185 F.3d at 1168 (citing 16 U.S.C. § 1604(i), 36 C.F.R. § 219.10(e)).

NFMA imposes substantive duties on the Forest Service, one. of which is the duty to "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(B). One of NFMA's implementing regulations, Regulation 219.19, was promulgated to ensure such diversity, and requires the Forest Service to manage:

[f]ish and wildlife habitat ... to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning

purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

36 C.F.R. § 219.19; *see also* 36 C.F.R. § 219.27(a)(6) (requiring that "[a]ll management prescriptions shall ... [p]rovide for adequate fish and wildlife habitat to maintain viable populations of existing native vertebrate species and provide that habitat for species chosen under § 219.19 is maintained and improved to the degree consistent with multiple-use objectives established in the plan").

As one of the ways to determine whether the habitat is sufficient for these purposes, the Forest Service identifies management indicator species ("MIS"), which operate as a class representative for several similar species, for each area. *See* 36 C.F.R. § 219.19(a). In this case, the blue grouse is an MIS identified in the Forest Plan. The parties' dispute centers around what type of population viability analysis Regulation 219.19 required the Forest Service to perform on the blue grouse in connection with the Project.

As a preliminary matter, the Forest Service argues that Plaintiffs' whole monitoring claim is based on the erroneous assumption that the Project involves the logging of "mature timber," for which the blue grouse was designated as the MIS. However, the Forest Service asserts that the Project affects only "dead or dying" spruce trees, not "mature timber." Therefore, the Forest Service argues that even if there had been a failure to adequately monitor the blue grouse, which they do not concede, the logging of dead spruce does not put the viability of the blue grouse population in the project area at risk. However, The Forest Service's argument fails to recognize that there is mature timber interspersed with the dead and dying timber that will be logged in the Project area. Moreover, the Forest Service acknowledges that the blue grouse would be affected by the proposed timber sale by including mitigation measures for the blue grouse in the FEIS. Therefore, the Forest Service's present assertion that the blue grouse would not be affected is unpersuasive and the court concludes that a viability assessment of the blue grouse population was necessary in the Forest Service's analysis of the Project.

■ Therefore, the issue the court must address is what level of viability analysis was necessary in the FEIS. Plaintiff asserts that in order to comply with NFMA regulations the Forest Service must compile quantitative population data for the MIS (e.g., the number of animals, including reproductive animals, found in the area) not just habitat trend data. The Forest Service disputes Plaintiffs' claim that only population counts are an adequate monitoring method and contends that the habitat trend data in the FEIS is sufficient.

■ The Tenth Circuit has not dealt with the specific issue of what type of data NFMA's implementing regulations require for an MIS affected by a particular project. However, other courts have dealt with this issue and judicial authority is split. *Compare Sierra Club v. Martin,* 168 F.3d 1, 6 (11th Cir.1999) *with Inland Empire Public Lands v. United States Forest Service,* 88 F.3d 754, 760 n. 6 (9th Cir. 1996). In *Inland Empire,* a case in which data for the MIS was not available, the Ninth Circuit allowed the Forest Service

to use habitat trend data rather than requiring actual population counts. In *Martin*, in which the Forest Service had failed to obtain data on half of the MIS for the project area, the Eleventh Circuit required the Forest Service to use actual hard data. The *Martin* court distinguished *Inland Empire* based on the fact that in that case the population information for the MIS was unavailable. However, the *Martin* court also acknowledged that the court's analyzed the regulations differently and respectfully disagreed with the Inland Empire court's analysis of the regulations.[1]

The Tenth Circuit has dealt with this issue only in the context of whether population data was required on a lynx species that was not a MIS and was no longer known to inhabit the project area. In *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1170 (10th Cir. 1999), the court found that before approving an expansion of a ski resort, the Forest Service did not need to collect population data for an elusive lynx whose only tie to the project area was some tracks that had been spotted in the area. The *Dombeck* court agreed with the reasoning of *Inland Empire* and distinguished the *Martin* decision. In distinguishing the *Martin* decision, the court noted that the cases differed in two significant respects: "(1) they involved the application of § 219.19 under circumstances in which population data was available; and (2) they involved the provisions of § 219.19 applicable to the use of a Management Indicator Species as a proxy for determining the effects of management activities on other species." *Id.* at 1170. However, the *Dombeck* court also noted that because the population inventory requirements of § 219.19 that apply to

Management Indicator Species are irrelevant to the issue before [the court], "[i]t would be inappropriate to comment here on the soundness of those opinions requiring population inventories and data-based viability assessments under very different facts and forest planning contexts." *Id.*

Similarly, the present case differs significantly from *Dombeck* in that it involves an MIS. However, whether population data was available for the blue grouse in the present case is not as clear. Both parties agree that until 1991 the Forest Service relied on blue grouse population data collected by the Utah Division of Wildlife Services. However, in 1991, the Utah DWR stopped collecting data on the blue grouse, and no population data has been collected since that time. The Forest Service states that when DWR discontinued its data collection on the blue grouse, the Forest Service was inclined to find a better MIS rather than begin collecting its own data. Since 1992, the Forest Service has allegedly tried to track the northern goshawk, which it has deemed a better MIS for the area. Plaintiffs argue that in order to change the MIS the Forest Service would need to formally revise the Forest Plan and such a change was never done. Therefore, the data on the northern goshawk is irrelevant and this court must determine only whether the Forest Service adequately analyzed the effects of the Project on the blue grouse population. Despite the fact that there was no population data on the blue grouse, the Forest Service states that habitat data for the blue grouse and northern goshawk was available and analyzed in the FEIS and with this habitat data it was able to determine

---

1. The one issue that both courts agree upon is that Section 219.19 applies at the sitespecific level for proposed projects under already enacted Forest Plans even though there is only a reference to the formulation of Forest Plans.

*See Sierra Club v. Martin*, 168 F.3d 1, 6 (11th Cir.1999); *Inland Empire Public Lands v. United States Forest Service*, 88 F.3d 754, 760 n. 6 (9th Cir.1996).

that neither species would be significantly adversely impacted by the project.

The issue for this court to determine is not affected by whether or not the Forest Service was required to formally amend the Forest Plan given that the Forest Service used habitat data, rather than population data, for both the blue grouse and the northern goshawk. In *Inland Empire* the court concluded that the Forest Service's use of an alternative method of population trend analysis, rather than actual population data, complied with Section 219.19(a)(6) because the Forest Service had specifically found the MIS in question to be a reclusive species, for which "there is no technically reliable and cost-effective method of counting individual members of the species." 88 F.3d at 763 n. 12. Although the Forest Service has made arguments to this court that the blue grouse is also reclusive, the FEIS states that "Blue grouse can be found year round in much of the area." In addition, the Forest Service has not provided any documentation or record evidence that the blue grouse population data that was formerly collected by Utah DWR was not reliable or could not have been reliably collected by the Forest Service after 1991. Although population data on the blue grouse was not available after 1991, it does not appear that it was the result of an inability to collect such data as was the case in *Inland Empire*. Therefore, the court concludes that the data was available, the Forest Service just decided not to collect it.

Although the Forest Service's methodology is entitled to deference, its actions must be in accord with the governing regulations. Section 219.19 specifically states that "[p]opulation trends of the management indicator species will be monitored and relationships to habitat changes determined." 36 C.F.R. § 219.19(a)(6). Section 219.26 similarly requires the Forest Service to use quantitative data to measure a project's impact on forest diversity. In reviewing these regulations, the court agrees with the analysis of the *Martin* court:

> MIS are proxies used to measure the effects of management strategies on Forest Diversity; Section 219.19 requires that the Forest Service monitor their relationship to habitat changes. Section 219.26 requires the Forest Service to use quantitative inventory data to assess the Forest Plan's effects on diversity. If Section 219.19 mandates that MIS serve as the means through which to measure the Forest Plan's impact on diversity and Section 219.26 dictates that quantitative data be used to measure the Forest Plan's impact on diversity, then, taken together, the two regulations require the Forest Service to gather quantitative data on MIS and use it to measure the impact of habitat changes on the Forest's diversity. To read the regulations otherwise would be to render one or the other meaningless . . .

*Martin*, 168 F.3d at 7. Similarly, in analyzing the applicable regulations, a district court in the Tenth Circuit has also recently found that "[u]nder this clear language, [the Forest Service] may not rely solely on habitat trend data as a proxy for population data or to extrapolate population trends." *See Forest Guardians v. United States Forest Service*, 2001 WL 1705942 (D.N.M. Oct. 2, 2001). In reaching this conclusion, the *Forest Guardians* court recognized that "management indicator species represent a management shortcut. . . . Consequently, there is generally no reason to further short-cut the management monitoring process by relying on habitat trends to project management indicator species population data." *Id.*

In this case, the Forest Service admits that population data has not been collected

since 1991. Given this lack of data, there is no way for the Forest Service to meet the requirements in the regulations to analyze population trends. Therefore, the Forest Service's approval of the Project without actual or trend population data is contrary to the governing regulations. Accordingly, Plaintiffs have met their burden for reversal of the Forest Service's decision. *See Martin,* 168 F.3d at 4 (quoting *Simmons v. Block,* 782 F.2d 1545, 1550 (11th Cir.1986)) ("courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself."); *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (no deference due to agency interpretation that contradicts regulation's plain language).

## B. NEPA

■ Plaintiffs further claim that the Forest Service failed to follow the necessary NEPA process in at least two ways: 1) failing to show the project will meet the stated purpose and need of protecting this area from wildfires; 2) failing to respond adequately to comments from the EPA that questioned the premise of the project, funding issues, and fire danger issues. Procedurally, the Forest Service argues that Plaintiffs did not raise any of these issues in their appeal at the agency level. Therefore, they have failed to exhaust their administrative remedies on these issues and this court lacks jurisdiction over these new issues. Plaintiffs argue that they should not be required to exhaust administrative remedies on these issues because there was no practical way for Plaintiffs to know about this issue or raise it before the agency.

Under the Forest Service regulations, interested parties may comment upon proposed projects and may appeal project decisions administratively. *See* 36 C.F.R. §§ 215.3, 215.7, 215.11(a). However, judi-

cial review of decisions subject to administrative appeal is "premature and inappropriate unless the plaintiff has first sought to invoke and exhaust the[se] procedures." *Id.* § 215.20. The Tenth Circuit has held that it "will not review information that [a party] failed to include in the administrative record or present before [the agency]." *Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1528 n. 18 (10th Cir.1992). It would be improper, in a review of agency action, for this court to consider issues that were not passed on by the agency. *See Kleissler v. United States Forest Service,* 183 F.3d 196, 200 (3d Cir. 1999).

Although Plaintiffs claim that they could not raise these issues before the agency because they were not aware of the issues at that time, Plaintiffs admit that the record was available to them. Therefore, the court concludes that Plaintiffs could have raised these issues before the agency. Accordingly, the court finds that it is without jurisdiction to consider these issues that were not first presented at the agency level.

## CONCLUSION

Based on the above reasoning, the court concludes that Plaintiffs' Petition for Review of Agency Action seeking reversal of the Forest Services' approval of the South Manti Timber Salvage Project is GRANTED.