**UTAH ENVIRONMENTAL CONGRESS, Plaintiff,**

v.

**Dale BOSWORTH, as Chief of the Forest Service, et al., Defendants.**

**No. 2:02–CV–321 PGC.**

United States District Court, D. Utah, Central Division.

Sept. 25, 2003.

Janelle P. Eurick, American Civil Liberties Union of Utah, Salt Lake City, UT, Stephen H. Novak, Wildlaw Southern Apalachian Office, Ashville, NC, Ray Vaughan, Wildlaw, Montgomery, AL, for Plaintiffs.

Myesha K. Braden, U.S. Dept. of Justice, Environment & Natural Resources, Washington, DC, Jeffrey E. Nelson, U.S. Attorney's Office, Salt Lake City, UT, for Defendants.

## MEMORANDUM OPINION AND ORDER DISMISSING PLAINTIFF'S PETITION FOR REVIEW OF AGENCY ACTION AND AFFIRMING AGENCY DECISION

CASSELL, District Judge.

This case is before the court on Dale Bosworth's motions [19–1 and 19–2] to dismiss Utah Environmental Congress' petition for review of the agency decision and to affirm the Forest Service's Decision Notice published on November 7, 2001 which approved the Thousand Lakes Mountain Community Forestry Initiative Project (the "Project") in conjunction with the Forest Service's Finding of No Significant Impact ("FONSI"). This court has jurisdiction over this matter pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq* ("APA"). For the reasons stated below, the court finds that the For-

est Service's decision to approve the Project is not arbitrary, capricious, or otherwise contrary to law. The court therefore GRANTS defendant's motions.

## INTRODUCTION

In 1997, the Thousand Lakes Mountain Community Forestry Initiative Work Group (the "Group") was formed to encourage "timbermen, environmentalists, politicians, and federal land managers" to collaborate and guide the forest management policies on the Thousand Lakes Mountain area of the Fishlake National Forest.[1] This Group, which included plaintiff Utah Environmental Congress ("UEC") met on numerous occasions for discussions, field trips, and planning meetings.[2] This Group has expressed three primary concerns: 1) addressing spruce beetle infestation; 2) providing wood products to small businesses in the area which often cannot afford to bid on larger timber sales; and 3) promoting optimal forest and ecosystem health.[3]

The Thousand Lakes Community Forest Initiative Project (the "Project") focuses on a small part of the 75,000 acre Thousand Lakes Mountain area of the Fishlake National Forest.[4] The Project initially covered approximately 15,390 acres and included three Inventoried Roadless Areas: Thousand Lakes, Lookout Peak, and Solomon Basin.[5] The Project was de-

signed to address the spruce beetle infestation through vegetation management methods with minimal disturbance to the forest and to help local forest enterprises by producing timber.[6] Since its original proposal, the Project has shrunk in size to encompass timber harvests on 219 acres, over five units of Thousand Lakes Mountain.[7] In conjunction with the Project, the Forest Service altered boundaries of two Inventoried Roadless Areas.[8] The Project's three primary treatment activities are salvage removal, sanitation removal and commercial thinning.[9] The Project also includes approximately one-half mile of road construction and post-treatment activities which are designed to minimize erosion and unauthorized vehicle use and to reduce fuel loadings and competition.[10]

UEC argues that the Forest Service acted arbitrarily, capriciously and contrary to law when it issued its Decision Notice and Finding of No Significant Impact for the Thousand Lakes Mountain Community Forestry Initiative Project. UEC asks this court to reverse the agency decision on three grounds: first, that the Forest Service violated laws and regulations when it changed the boundaries of roadless areas previously inventoried as potential wilderness; second, that the Forest Service failed to monitor Management Indicator Species ("MIS") as required by the National Forest Management Act ("NFMA");

---

1. *See* Administrative Record ("AR"), Vol.1 at 000212.

2. *See* List of Participants, AR, Vol.1 at 00239; and Team Correspondence, AR, Vol.1 at 00214–336.

3. *See* Statement of Purpose, AR, Vol.1 at 000245.

4. *See* AR, Vol.1 at 000066.

5. *See* AR, Vol.1 at 000057–58 (EA 14–15 acreage of Project Area); *see also* AR, Vol.1 at 000422 (map of roadless areas).

6. *See* Environmental Assessment ("EA"), AR, Vol.1 at 000044.

7. *See* AR, Vol.1 at 000045.

8. *See* Roadless Area Conservation FEIS, AR, Vol.1 at 000185.

9. *Id.* at 000050.

10. *Id.* at 000051.

and third that the Forest Service violated the National Environmental Policy Act ("NEPA") and the Multiple–Use, Sustained–Yield Act ("MUSYA").

## STANDARD OF REVIEW

This court must affirm the Forest Service's Decision Notice approving the Project and issuing the FONSI unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [11] This is a narrow and deferential standard, and the "court is not empowered to substitute its judgment for that of the agency." [12] As explained by the Tenth Circuit Court of Appeals, federal courts "are limited to determining whether the agency substantially complied with statutory and regulatory procedures, whether substantial evidence supports its factual determinations, and whether its action was an abuse of discretion." [13] An agency's legislative interpretation may be disregarded only when it is contrary to plain and unambiguous statutory language, or if it is an impermissible interpretation of ambiguous statutory language. [14] Furthermore, an "agency's interpretation of its own regulations, including its procedural rules, is entitled to great deference." [15] The decisions of an agency are entitled to a presumption of regularity [16] and the party challenging the decision therefore has the burden of showing that the decision was unreasonable. [17]

Central to this case is the Forest Service's Finding of No Significant Impact ("FONSI") in relation to the Project. A FONSI is a document setting forth "the reasons why an action ... will not otherwise have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." [18] To make a threshold determination whether the environmental impacts of a proposed project are sufficiently significant to require the preparation of a comprehensive Environmental Impact Statement ("EIS"), the agency may prepare a less detailed Environmental Assessment ("EA"). [19] An EA is "a concise public document ... that serves to [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." [20]

■ Because the Forest Service's decision to issue a FONSI is "a factual determination which implicates agency expertise," it is reviewed under the arbitrary and capricious standard. [21] Under NEPA and NFMA, the Forest Service's approval

**11.** *Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1521 (10th Cir.1992).

**12.** *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

**13.** *Burke v. Board of Governors,* 940 F.2d 1360, 1365 (10th Cir.1991), *cert. denied,* 504 U.S. 916, 112 S.Ct. 1957, 118 L.Ed.2d 559 (1992) (citations omitted).

**14.** *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Quivira Min. Co. v. Nuclear Regulatory Comm'n,* 866 F.2d 1246, 1249 (10th Cir.1989).

**15.** *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 738 (10th Cir.1993).

**16.** *Citizens to Preserve Overton Park,* 401 U.S. at 415, 91 S.Ct. 814.

**17.** *Park County Resource Council, Inc. v. United States Dept. of Agriculture,* 817 F.2d 609, 621 (10th Cir.1987).

**18.** 40 C.F.R. § 1508.13.

**19.** 40 C.F.R. § 1501.4(a)-(c); *see* 40 C.F.R. § 1501.4(c)-(e), 1508.13; *see also* Forest Service Handbook 1909.15–41.1 (published at 57 Fed.Reg. 43,180, 43,210–11 (Sept. 18, 1992)).

**20.** 40 C.F.R. § 1508.9(a).

**21.** *See Committee to Preserve Boomer Lake Park v. Department of Transportation,* 4 F.3d 1543, 1555 (10th Cir.1993).

of the Project based on the EA and accompanying FONSI must be upheld if the court determines that the Forest Service took the required "hard look" at the probable environmental consequences of its proposed action and based its decision on a "reasoned evaluation of the relevant factors."[22] In reviewing the record, the court considers whether the Forest Service examined relevant data and articulated a satisfactory explanation for its action, including articulating a rational connection between the facts found and the choice made.[23]

## ANALYSIS

### I. Roadless Area Inventory

UEC argues that in order to justify the Project, the Forest Service illegally revalidated the roadless area boundaries within the Thousand Lakes Project area. Specifically, UEC argues that the Forest Service: 1) illegally revalidated Inventoried Roadless Areas ("IRAs") at the project level rather than at the forest-planning level; 2) ignored its own criteria in performing the revalidation; and 3) excluded the public and other agencies from the revalidation process.[24] The court addresses each argument in turn.

### A. Revalidation at the Project Level was Proper

■ UEC alleges that the Forest Service's efforts to revalidate its roadless inventory was illegal in a project-level EA. The intent of roadless inventories is to determine which areas meet the minimum qualifications for wilderness designation. UEC does not raise any substantial procedural violations, but instead challenges the act of revalidating roadless area boundaries outside of the Forest Plan revision process. The court finds that the Forest Service did not act arbitrarily or capriciously in applying its chosen method of revalidating IRAs at the project level for two reasons.

First, the IRAs in the Fishlake National Forest have been statutorily released from wilderness consideration by Congress. The Code of Federal Regulations mandates that "[u]nless otherwise provided by law, roadless areas within the National Forest System ("NFS") shall be evaluated and considered for recommendation as potential wilderness areas during the forest planning process."[25] However, the Utah Wilderness Act of 1984 designated specific NFS lands in Utah for inclusion in the National Wilderness Preservation System ("NWPS") while leaving other NFS lands in Utah as "areas ... to be managed for multiple use ... provided, that such areas need not be managed for the purpose of protecting their suitability for wilderness designation."[26] By refusing to designate the Fishlake National Forest as wilderness to be included in NWPS, the Utah Wilderness Act released the IRAs on the Fishlake National Forest for "nonwilderness multiple uses"[27] and eliminated the need for further consideration of those areas for potential wilderness designation.[28]

Second, revalidation at the project level rather than the forest-planning level was

---

**22.** *See Burke v. Board of Governors,* 940 F.2d 1360, 1365 (10th Cir.1991).

**23.** *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

**24.** *See* Plaintiff's Amended Brief in Support of Plaintiff's Petition for Review of Agency Action ("Plaintiff's Brief") at 8.

**25.** 36 CFR § 219.17 (emphasis added).

**26.** *See* Utah Wilderness Act of 1984, Pub.L. No. 98–428.

**27.** *See id.; see also* AR, Vol.1 at 000430.

**28.** *See* Pub.L. No. 98–428; *see also* Forest Plan, AR, Vol.1 at 000544a, at 2.

proper in this case. UEC's claims to the contrary rest largely on the appeal deciding officer's decision in the Seven Mile Salvage Timber Sale appeal decision (the "Seven Mile Decision") as initially released.[29] That decision, however, was later amended.[30] The amendment clarified that "[i]t is not inappropriate to use the Draft Inter-mountain Region. Planning Desk Guide ... at the project level to update roadless area inventories."[31] In addition, the amendment referenced the applicability of the Utah Wilderness Act to the Fishlake National Forest, stating, "[b]ecause Congress had already designated Wilderness in Utah before the Fishlake Forest Plan was approved, it was no longer necessary to identify potential wilderness in the Forest Plan."[32] This court has previously found no evidence of bad faith in the amendment.[33] The Seven Mile Decision, as amended, confirms the appropriateness of the methodology used by the Forest Service to revalidate the IRAs at the project level in this case.

## B. The Forest Service Followed Proper Revalidation Procedures

UEC next argues that the revalidation was inadequate because the Forest Service "did not undertake any fieldwork in preparing" the revalidation.[34] UEC cites no

authority to establish that "on-the-ground" field work is necessary for completing a validation of IRA boundaries. Furthermore, the Administrative Record establishes that the revalidation was completed according to the process outlined in the Draft Inter-mountain Region, Planning Desk Guide (the "Desk Guide").[35]

The Desk Guide sets forth criteria established by the Intermountain Region for conducting roadless area inventories, in accordance with Chapter 7 of the Forest Service Planning Handbook.[36] Pursuant to the Desk Guide, the Forest Service appointed an interdisciplinary team ("IDT") to prepare the revalidation using the modern Geographic Information Systems technology ("GIS").[37] The IDT considered evidence of logging, road construction, constructed ponds and reservoirs and other evidence of human activity which altered the landscape of area previously identified as roadless.[38]

■ The Administrative Record reveals that the Forest Service used a three-step process for revalidation of IRA boundaries in this case. First, the IDT reviewed GIS maps that "identified all areas within the project that did not have significantly noticeable roads, timber harvest or other man-made features that would preclude consideration as roadless based on Region 4 protocols."[39] This examination involved

**29.** Appeal # 01–04–00–0011 decision, January 26, 2001 (attached as exhibit A to plaintiff's amended brief in support of petition for review [16–1] ).

**30.** *See* Letter from Appeal Deciding Officer to Craig Axford, March 9, 2001 (attached as exhibit A to defendants' memorandum in support of motion to strike [22–1] ).

**31.** *See id.* at 2–5 (internal quotations omitted); *see also* Desk Guide, AR, Vol.1 at 000432.

**32.** *Id.*

**33.** *See Utah Environmental Congress v. Bosworth*, No. 2:01–CV–00316–PGC (D.Utah, March 27, 2003) at 14.

**34.** *See* Plaintiff's Brief at 15–16.

**35.** *See* Desk Guide, AR, Vol. 1 at 000432 *passim.*

**36.** *See* FSH 1909.12, 8/92.

**37.** *See* Desk Guide, AR, Vol. 1 at 000435.

**38.** *See* 2/7/00 1900 Letter, AR, Vol. 1 at 000416.

**39.** 3/21/00 1950 Letter, AR, Vol. 1 at 000423.

consideration of both a "GIS road layer (which assumes all roads in the database have been validated as roads)" and a GIS "past activities layer" which shows human impact to the land.[40] This overlay allowed the IDT to identify polygons that would be considered as either within or outside of the IRA boundaries. The next step, "refining GIS polygons to clean up areas that do not meet criteria of roadless," required the use of professional judgment.[41] Accordingly, the IDT considered the observations and judgment of those Forest Service employees with "on-the-ground" knowledge of the areas in question when delineating IRA boundaries.[42] The third and final step, which will take place during the Forest Plan revision process, is consideration of the roadless areas for wilderness designation.[43] "The agency, not the reviewing court, its entrusted with the responsibility of considering the various modes of scientific evaluation ... and choosing the one appropriate for the given circumstances."[44] Here the agency's choice is within the permissible boundaries of agency discretion.

### C. The Revalidation Process Included the Public

 UEC also argues that the Forest Service should have issued an official pronouncement of its intent to conduct a revalidation of the IRA boundaries within the Project area.[45] Such an argument is questionable considering UEC's involvement with and knowledge of the Forest Service's revalidation efforts. The Administrative Record demonstrates that the IDT discussed the protocol for analyzing roadless areas with the Thousand Lakes Mountain Community Forestry Initiative Group ("the Group") before the revalidation ever took place.[46] In fact, the Administrative Record demonstrates that the IRA revalidation was scheduled to be a topic of discussion for the Group's January 21, 2000, meeting.[47] Craig Axford, UEC's Program Director and a member of the Group, was invited to the meeting and made aware of the proposed topics of discussion.[48]

During a March 15, 2000, conference call, the Forest Service made a commitment to UEC to review the agency's roadless protocol.[49] Moreover the Forest Service explained to UEC and other members of the Group that the agency intended to show direction from the Chief of the Forest Service not to log in roadless areas.[50] The Forest Service also acquiesced to the Group's request that the agency mark its roadless revalidation with the GPS system.[51] At that time, the Forest Service agreed to include the Wild Utah Forest Campaign ("WUFC") in its roadless revalidation efforts. The revalidation was again scheduled to be the topic of discussion at the Group's March 22, 2000, meeting.[52]

---

40. 4/10/00 Memo and Summary Notes, AR, Vol. 1 at 000280–81.

41. *Id.*

42. *Id.*

43. *Id.*

44. *Custer County Action Assn. v. Garvey*, 256 F.3d 1024, 1036 (10th Cir.2001) (*quoting City of Bridgeton v. Federal Aviation Admin.*, 212 F.3d 448, 459 (8th Cir.2000)).

45. *See* Plaintiff's Brief at 13.

46. *See* 2/2/00 1950 Letter, AR, Vol. 1 at 000229.

47. *See* 1/14/00 Memo, AR, Vol. 1 at 000270.

48. *See* Mailing List, AR, Vol. 1 at 000272.

49. *See* Minutes, 3/15/00, AR, Vol. 1 at 000331.

50. *Id.*

51. *Id.*

52. *See* 3/15/00 Memo, AR, Vol. 1 at 000275.

Again, Craig Axford was invited to attend the meeting and informed of the selected topics of discussion.[53]

In 1999, UEC conducted its own inventory of Inventory Roadless Areas ("IRAs") in the Fishlake National Forest.[54] However, although the Forest Service became aware of UEC's efforts, as of the April 14, 2000, meeting of the Group, UEC had not provided the agency with a copy of their inventory version.[55] At that meeting, a map outlining changes to IRA boundaries as a result of the agency's revalidation was passed out to the Group.[56] A detailed summary of the revalidation process and results were also provided to the members of the Group.[57] Moreover, the Forest Service discussed the possibility of using UEC's inventory maps to adjust or rectify the agency's revalidation results.[58] Each of the these items and a summary of the minutes of the meeting were sent to Craig Axford.[59]

The Forest Service approved the IRA revalidation on April 27, 2002.[60] After reviewing the revalidation, the Group accepted the agency's recommendation.[61] Due to public comments, implementation of the Project had previously been delayed for the revalidation.[62] As a result of revalidation, the Project was modified to eliminate certain areas of proposed timber harvest.[63] Ultimately, the harvest area was reduced from 335 acres to 219 acres.[64] The EA contains detailed discussion of the IRA validation and its effects.[65]

Courts must "defer to agency expertise on questions of methodology unless the agency has completely failed to address some factor."[66] Because the Forest Service's revalidation of IRAs was conducted pursuant to the Draft Inter-mountain Region Planing Desk Guide, this Court affirms the revalidation. UEC does not allege any substantive statutory violation. Moreover, the Administrative Record reveals that the Forest Service's decision was informed by adequate data and the institutional knowledge and judgment of Forest Service professionals. "The court may not set aside agency action as arbitrary and capricious unless there is no rational basis for the action."[67] Although UEC may disagree with the results of the revalidation, the record establishes that the relevant guidelines, policies and law demonstrate that it was properly conducted. Therefore, the Forest Service's revalidation of IRAs is affirmed.

---

53. *See* Mailing List, AR, Vol. 1 at 000277.

54. *See* UEC Comment Letter, AR, Vol. 1 at 000179.

55. *See* 4/17/00 Meeting minutes, AR, Vol. 1 at 000333.

56. *See* 4/10/00 Memo and Summary Notes, AR, Vol. 1 at 000280–81.

57. *Id.; see also* Maps and GIS Layers, AR, Vol. 1 at 000419–22.

58. *Id.* 4/17/00; *see also* Meeting minutes, AR, Vol. 1 at 000334.

59. *See* Mailing List, AR, Vol. 1 at 000286.

60. *See* EA, AR, Vol. 1 at 000058.

61. *See* 4/4/00 1950 Letter, AR, Vol. 1 at 000233

62. *See* EA, AR, Vol. 1 at 000044.

63. *See* 4/4/00 1950 Letter, AR, Vol. 1 at 000233.

64. *See* EA, AR, Vol. 1 at 000045.

65. *See* AR, Vol. 1 at 000058–59.

66. *Inland Empire Public Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993).

67. *Friends of the Earth v. Hintz,* 800 F.2d 822, 831 (9th Cir.1986).

## II. Management Indicator Species Monitoring

UEC alleges that the Forest Service failed to monitor Management Indicator Species ("MIS") and analyze the effects of the Project on the MIS in violation of the National Forest Management Act ("NFMA"), its implementing regulations, the Forest Plan, and the National Environmental Policy Act.[68] As recently explained by this court in the *Zieroth* case, the NFMA imposes substantive duties on the Forest Service, one of which is the duty to "provide for diversity of plant and animal communities."[69] One of the NFMA's implementing regulations, Regulation 219.19, requires the Forest Service to manage:

[f]ish and wildlife habitat … to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.[70]

As one of the ways to determine whether the habitat is sufficient for these purposes, the Forest Services identifies select MIS which operate as a sort of "class representative" for similar species in the area. In addition the NFMA requires that "each Forest Supervisor shall obtain and keep current inventory data appropriate for planning and managing the resources under his or her administrative jurisdiction."[71]

This court's recent decision concerning the Monroe Mountain timber cutting projects[72] adopted the *Zieroth*[73] approach to MIS monitoring and analysis, which generally requires the Forest Service to use quantitative population data at the project level when feasible.[74] While there appears to be a split of authority on this point,[75] this court's approach in both *Zieroth* and the recent unpublished Monroe Mountain ruling is consistent with the rule that "the Forest Service may not rely *solely* on habitat trend data as a proxy for population data or to extrapolate population trends."[76] The court notes that *Zieroth* does not require "head counts" of MIS at the project level. In *Zieroth*, the Forest Service had conceded that since 1991 it had not gathered *any* population data on the blue grouse at the forest-wide level, and *nothing* in the record indicated that

---

68. *See* Plaintiff's Brief at 19.

69. *Utah Environmental Congress v. Zieroth,* 190 F.Supp.2d 1265, 1268 (D.Utah 2002).

70. 36 C.F.R. § 219.19.

71. 36 C.F.R. § 219.12(d).

72. *See Utah Environmental Congress v. Bosworth,* No. 2:01–CV–00316–PGC (D.Utah, March 27, 2003).

73. *Utah Environmental Congress v. Zieroth,* 190 F.Supp.2d 1265, 1268 (D.Utah 2002).

74. *Id.* at 1270–72.

75. *Compare Sierra Club v. Martin,* 168 F.3d 1, 6 (11th Cir.1999) *with Inland Empire Public Lands v. United States Forest Service,* 88 F.3d 754, 760 n. 6 (9th Cir.1996).

76. *Zieroth,* 190 F.Supp.2d at 1271 (*quoting Forest Guardians v. United States Forest Service,* 180 F.Supp.2d 1273 (D.N.M.2001)) (quotations omitted) (emphasis added).

the Forest Service had collected or reviewed any otherwise available population data concerning the blue grouse. On the other hand, in the recent Monroe Mountain decision, this court found that reversal for failure to collect or analyze MIS population data would not be proper "because the Forest Service had either collected the appropriate population data or had a valid reason for not collecting such data." [77] The court's opinion stated:

> the NFMA only requires the Forest Service to maintain "viable populations" of MIS. If the Forest Service can determine from Project area data the actual viability of a population (as it did in this case), no further data is required ... the court will not interpret the NFMA to require the impossible ... faced with difficult-to-count species, the Forest Service could make a reasonable choice about whether to use limited resources for this purpose [and] the court defers to the Forest Service's expertise in determining whether sampling is appropriate. [78]

The Forest Plan for the Fishlake National Forest sets forth the monitoring and evaluation program for the entire forest. [79] The Forest Plan establishes two categories of MIS for the Forest Plan's purposes: one for ecological indicators and the other to represent species of high interest. [80] According to the Forest Plan, the ecological Management Indicator Species are selected based on the following general criteria:

1) strong affinity for the vegetation type; 2) life cycle keyed to vegetation type; 3) sensitivity to habitat change; 4) relative ease of monitoring; and 5) somewhat representative of other species using the same vegetation type. [81] Ecological MIS include the goshawk, sage nester, cavity nester, riparian species, macroinvertebrates, and resident trout. [82] High interest MIS include elk, mule deer and cutthroat trout. [83] While UEC has essentially used a "shotgun approach" to challenge the monitoring and analysis of *all* MIS in the Forest Plan, UEC's substantive arguments are focused almost exclusively on the three ecological indicator MIS guilds selected by the Forest Service to represent habitat concerns in and around the Project area: 1) sage nesters, 2) riparian species, and 3) cavity nesters. [84]

## A. Riparian, Sage, and Cavity Nester MIS Guilds Were Sufficiently Monitored

In 1994, the Forest Service conducted a Neotropical bird survey, which plotted the locations of documented sightings of cavity nesting, sage nesting, and riparian birds over approximately 18% of the entire forest area. [85] Then, in 1998, the Forest Service conducted a forest-wide survey that documented over 100 species of birds from all three guilds. [86] The Forest Service's own data gathering is regularly supplemented by forest-wide data obtained from other state entities such as the Utah Division of Wildlife Resources and the Utah state universities. [87]

**77.** *Utah Environmental Congress v. Bosworth,* No. 2:01–CV–00316–PGC at 18.

**78.** *Id.* at 19.

**79.** *See* AR, Vol. 1 at 000157 (CD Part A at V–2).

**80.** *Id.* (CD Part A at III–34 to –36).

**81.** *Id.*

**82.** *Id.*

**83.** *Id.*

**84.** *Id.; see also* Defendant's Reply Brief at 13 (citation omitted).

**85.** *See* Burnt Flats Survey, AR, Vol. 1 at 000966 through –977.

**86.** *See* 1998 Bird Survey, AR, Vol. 1 at 001077.

**87.** *See* AR, Vol. 1 at 001374–376.

■ UEC challenges the Forest Service's monitoring of the sage nester guild and the selection of the sage grouse to represent the guild. A "guild" is a group of species that exploit the same class of environmental resources in the same way.[88] In its attempts to monitor the sage nester guild the Forest Service observations and radio telemetry data showed no sage grouse on the Thousand Lakes Mountain, no evidence of other potential sage nesting species in the Project area, and a dearth of sagebrush habitat within the Project area.[89] No sage nesters have ever been documented along the road in the Project area, and in July 2000, the forest wildlife biologist performed a walk-through reconnaissance of the Project area for sage nesting species but documented none.[90] Based on its analysis of the relevant data, including habitat trends of the guild, the Forest Service determined that the Project's effect on sage nesters will be minimal because the Project will only disturb .01% or less of the total available habitat on Thousand Lakes Mountain.[91] UEC's argument that use of the sage grouse as guild representative was improper is without merit. The Forest Plan specifically provides that the sage nester guild includes "sage dependant species" to be selected "on a case by case basis." [92] In this case, the Forest Service selected the sage grouse, but found no sage nesters of any kind in the Project area and concluded that the area contains virtually no suitable habitat for sage nesters.

UEC next argues that the Forest Service failed to collect data on the Southwestern Willow Flycatcher (the "flycatcher"). Field surveys show that no flycatchers have been documented in the area.[93] The Forest Service is not required to expend scarce resources on pointless exercises. UEC also challenges selection of the flycatcher as MIS, arguing that the water pipit is the appropriate MIS guild representative; however, the Forest Plan allows selection of "riparian dependant species from the wide array of habitat types found in the riparian zone." [94] Furthermore, the flycatcher has been documented near the Project area and has been observed on various occasions between 1983 and 2000.[95] UEC argues that the water pipit should have been selected based on its claims the Project area contains "numerous high elevation wet meadow areas;" however, such a factual proposition is unproven by UEC and disputed by the Forest Service. The Forest Service's choice is entitled to deference on its selection of MIS, and its choice of the flycatcher was reasonable.

UEC argues at length that the Forest Service's selection and monitoring of the cavity nester guild is flawed. The Forest Service chose two species to represent the cavity nester guild, the three-toed woodpecker ("woodpecker") and the flammulated owl.[96] While visual and auditory surveys in the summer of 2000 detected the

---

**88.** *See* Defendant's Supplemental Brief Regarding MIS at 3 (*citing* Simberloff and Dayan, "The Guild Concept and the Structure of Ecological Communities," *published in Annual Review of Ecology and Systematics*, Vol. 22, 115–143 (1991)).

**89.** *See* AR, Vol. 1 at 000073 and 000079.

**90.** *Id.* at 000078 and Vol. 2 at 001247.

**91.** *Id.* at 000783.

**92.** *See* AR, Vol. 1 at 000157 (CD Part A at III–35).

**93.** *See* AR, Vol. 1 at 000768.

**94.** *Id.* at 000157 (CD Part A at III–34).

**95.** *Id.* Vol. 2 at 001251.

**96.** *See* AR, Vol. 1 at 000078.

woodpecker (present wherever beetle is found) on Thousand Lakes Mountain, the forest service determined that the impacts from the Project on the woodpecker would be minor because the Project area represents less than 2% of the potential woodpecker habitat in the forest.[97] Unlike the woodpecker, the flammulated owl is a secondary species of cavity nesters which does not find optimal breeding habitat among the spruce dominated forest of the Thousand Lakes Mountain.[98] The Forest Service considered that documentation of the flammulated owl near the Project area might indicate the presence of owl habitat in the area.[99] The Forest Service then drew data from surveys conducted on Thousand Lakes Mountain in 1991 and 1993 and determined that retention of 300 large snags over 100 acres in the project area would maintain important snag habitat and that commercial thinning may actually provide increased habitat for the flammulated owl.[100] The Administrative Record therefore establishes that the Forest Service considered the relevant information and made a reasoned decision-the APA requires no more.

### B. MIS Monitoring Was Sufficient

■ UEC's challenge of the Forest Service's goshawk monitoring borders on the disingenuous, given the extensive data concerning goshawk monitoring in the Administrative Record, including aerial surveys, ground surveys, walk-throughs, and other miscellaneous surveys.[101] UEC has not met its burden of showing failure to adequately monitor the goshawk. Similarly, UEC presents no legitimate argument challenging the Forest Service's determi-

nation that no significant effects on trout and macroinvertebrates were anticipated given that none of the streams in the Project area are known fisheries and the two lakes in the analysis area are downstream from the Project area.[102] With regard to any remaining MIS, including high interest MIS like the mule deer and elk, UEC has provided no specific explanations of how the Forest Service actions have been inadequate.

In sum, UEC has failed to establish that the Forest Service failed to properly monitor MIS population and habitat trends as required under the NFMA. The record demonstrates that the Forest Service has complied with the Forest Plan for collecting and monitoring population and habitat data for analysis at both the forest-wide and project levels. Neither the NFMA or its implementing regulations require "head counts" at the project level. Indeed, in this case, head counts appear to be especially unreasonable, given the Forest Service's determination that certain MIS habitats were lacking and that some of the MIS guild species had never been documented in the 219–acre area. Giving due deference to the Forest Service's findings and methodology in this highly technical area, the court finds that the Forest Service satisfied its obligations to monitor MIS under the NFMA and applicable regulations.

### III. Compliance with NEPA and MUS-YA

UEC argues that the Forest Service failed to comply with the National Environmental Policy Act ("NEPA") and the

---

97. *Id.* at 000070 and 000151.

98. *Id.* at 000075–76.

99. *Id.*

100. *Id.*

101. *Id.* at 000076, 000232, 000736, 000771, 001247.

102. 4/3/00 1950/2600 Letter, AR, Vol. 1 000388.

Multiple Use Sustained Yield Act ("MUS-YA"). Under NEPA, agencies must take a "hard look" at the environmental consequences of a management decision.[103] NEPA does not "mandate particular results but simply prescribes the necessary process."[104] Under MUSYA, the Forest Service must give "due consideration ... to the relative values of the various resources in particular areas" in its administration of the national forests.[105] UEC argues that the Forest Service failed to comply with NEPA, MYUSA and "other laws" because it failed to: 1) respond adequately to comments received; 2) prepare an adequate economic analysis; 3) prepare an adequate cumulative effects analysis; and 4) consider an adequate range of alternatives. The court addresses each argument in turn.

### A. The Forest Service Adequately Responded to Public Comments

UEC first argues that the Forest Service failed to respond adequately to comments received. UEC's brief cites the Tenth Circuit's decision in *Utahns for Better Transportation v. United States Department of Transportation* for the proposition that NEPA requires the Forest Service to "verify the accuracy of information supplied by an applicant ... and respond to substantive issues raised in comments."[106] However, it is unclear whether *Utahns for Better Transportation* is applicable to this case. The underlying regulation, 40 C.F.R. § 1503.4(a), states "[a]n agency preparing a *final environmental impact statement* shall assess and consider comments." Similarly, 40 C.F.R. § 1506.5(a) applies only when "an agency *requires an applicant* to submit environmental information for possible use by the agency in preparing *an environmental impact statement*."[107] Here, the Forest Service never prepared an environmental impact statement and the agency never "required" UEC to submit "environmental information" for any purpose. UEC has never asserted that it is an "applicant" under 40 C.F.R. § 1506.5.

■ Even if *Utahns for Better Transportation* controls this case, the Forest Service complied with its duty "to respond to substantive issues raised in comments"[108] under NEPA. "An agency has a limited obligation to respond to public comments," and "not every comment need be published in the final [impact statement]."[109] The regulations provide for any of a number of "possible responses" to comments, including modifying the proposed action; developing and evaluating alternatives not previously seriously considered: supplementing, improving, or modifying the agency's analyses; making factual corrections; and explaining why comments do not warrant further agency response.[110]

UEC asserts that the Forest Service failed to adequately respond to three specific comments: 1) a March 17, 2000 letter

---

**103.** *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

**104.** *Inland Empire Pub. Lands Council v. United States Forest Serv.,* 88 F.3d 754, 758 (9th Cir.1996).

**105.** 16 U.S.C. § 529.

**106.** *Utahns for Better Transp. v. United States Dept. of Transp.,* 305 F.3d 1152, 1165 (10th Cir.2002) (*citing* 40 C.F.R. §§ 1503.4(a),

1506.5(a)) (additional citations and internal citations omitted).

**107.** 40 C.F.R. §§ 1503.4(a), 1506.5 (emphases added).

**108.** *Utahns for Better Transp.,* 305 F.3d at 1165 (citations omitted).

**109.** *State of California v. Block,* 690 F.2d 753, 773 (9th Cir.1982).

**110.** *See* 40 C.F.R. § 1503.4(a).

allegedly sent to the District Ranger asking for information on Forest Service beetle monitoring;[111] 2) a request that the agency include in its analysis "detailed documentation" concerning jobs and industries dependent on forest products;[112] and 3) a June 26, 2001 request by UEC for an explanation of the Project's economic viability echoed by the Forest Conservation Council's comment that "adverse economic effects have not been identified or quantified."[113] While they may be disappointing to UEC, the Forest Service gave adequate responses to the substantive issues raised regarding forest industry and economic viability. UEC's recent claim that one of the responses was not written in plain English is meritless. Besides the responses acknowledged by UEC in its own brief, both the Decision Notice and EA contain plain language responses to economic and industry concerns in relation to the Project, and they refer readers to the Forest Plan for even more economic information.[114] Assuming the March 17, 2000 letter was received and processed by the proper authorities, it would be the only comment cited by UEC with no apparent direct response from the Forest Service. There is no evidence that the Forest Service deliberately ignored the comment which largely duplicated other comments concerning beetle activity monitoring in the forest. Given UEC's on-the-ground involvement with the Group in Project planning, this court is unwilling to invalidate the decision to approve the Project based on a single allegedly unanswered request for information.

### B. The Forest Service Prepared an Adequate Economic and Social Analysis

Second, UEC argues that the Forest Service failed to prepare an adequate economic analysis of the project, taking into consideration the jobs associated with forest protection as compared to those related to logging and wood production. Under MUSYA, the Forest Service must give "due consideration" to the relative values of resources in particular areas.[115] MUSYA requires the Forest Service to manage its forests for multiple uses, including "manag[ing] ... all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people."[116] A reviewing court must, however, "defer to agency expertise on questions of methodology unless the agency has completely failed to address some factor."[117]

UEC argues that MUSYA required the Forest Service to consider a nationwide increase in forest protection jobs relative to timber producing jobs and that the agency failed to consider this trend despite language in its own manual which, according to UEC, necessitates "the use of economic and social analysis."[118] However, under the regulations, the weighing of the merits and drawbacks of various alternatives need not be presented in a monetary cost-benefit analysis where important qualitative considerations are at issue.[119]

111. Plaintiff's Brief at 38–39.

112. *Id.* at 39.

113. *Id.* at 40.

114. *See* AR, Vol. 1 at 000146–152 and 000048–49.

115. 16 U.S.C. § 529.

116. 16 U.S.C. § 531.

117. *Inland Empire Pub. Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993).

118. Plaintiff's Petition for Review at 41–42 (citations omitted).

119. *See* 40 C.F.R. § 1502.23.

In any event, the EA here demonstrates that the Forest Service analyzed the cost and revenues of the Project.[120] This conclusion is bolstered by the Quick–Silver Investment Analysis prepared during Project development.[121] In addition, because the Project involves only an EA and not an EIS, the Forest Service was not under the same duty to prepare the detailed economic analysis which might be prepared for an EIS.[122] Finally, after being reduced to 219 acres, the project area is simply too small to justify the kind of technical economic analysis demanded by UEC. Economic and social analysis is contained in the Forest Plan which the agency followed in preparing its EA. In sum, the court finds that the Forest Service gave due consideration to the relative values of resources in the Project area and other relevant factors, and the court defers to the Forest Service's methodology in doing so.

## C. The Forest Service Prepared an Adequate Cumulative Impacts Analysis

Third, UEC argues that the Forest Service failed to prepare an adequate cumulative impacts analysis for the project. The Tenth Circuit has held that, "in determining whether a proposed action will significantly affect the environment and therefore trigger an EIS, the agency must consider ... [w]hether the action is related to other actions with individually

insignificant but cumulatively significant impacts."[123] The Tenth Circuit has explained that "[c]ertainty as to the cumulative effects of resource development projects require prophecy beyond the capabilities of both scientists and courts. Neither are endowed with divine inspiration. It is enough that the EIS mentions and discusses foreseeable problems."[124] "If the effects cannot be readily ascertained," detailed discussion of them "is not contemplated under NEPA."[125]

In addition, the Tenth Circuit has repeatedly rejected arguments that NEPA requires specific consideration of projects that have not yet been proposed. For example, in *Sierra Club v. Lujan*, the plaintiffs had argued that an EA for a county road project failed to consider future plans for the entire road.[126] The Tenth Circuit specifically rejected this argument:

Throughout the course of this litigation, Garfield County has openly stated that its long range aims include paving the full length of the Burr Trail. Long range aims, however, are quite different from concrete plans and specific undertakings such as the Harper contract submitted for purposes of environmental analysis under NEPA. NEPA does not require an agency to consider the environmental effects that speculative or hypothetical projects might have on the proposed project.[127]

---

120. *See* AR, Vol. 1 at 000093.

121. *Id.* at 000339–341.

122. *See* 40 C.F.R. § 1502.23.

123. *Airport Neighbors Alliance, Inc. v. United States,* 90 F.3d 426, 430 (10th Cir.1996).

124. *Manygoats v. Kleppe,* 558 F.2d 556, 560–61 (10th Cir.1977) (discussing preparation of an environmental impact statement).

125. *Environmental Defense Fund, Inc. v. Andrus,* 619 F.2d 1368, 1375 (10th Cir.1980).

126. *Sierra Club v. Lujan,* 949 F.2d 362, 368 (10th Cir.1991).

127. *Id.*(internal citations omitted); *see also Airport Neighbors Alliance, Inc. v. United States,* 90 F.3d 426, 431 (10th Cir.1996) ("analyzing possible future actions ... that are far from certain would result in 'a gross misallocation of resources, would trivialize NEPA, and would diminish its utility in promoting useful environmental analysis for major federal actions that truly affect the environment.' ") (*quoting Park County Resource Council, Inc. v. United States Department of*

While this case does not involve the preparation of an EIS, in reviewing the cumulative impacts analysis of an EIS for compliance with the relevant statute,[128] the court's role is limited to determining whether the EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" and provides information which is reasonably sufficient to "enable the decision-maker to consider environmental factors and make a reasoned decision." [129]

■■■ In this case, cumulative effects of the Project are thoroughly discussed throughout the EA.[130] The agency's analysis is reflected in a number of documents in the record. Potential impacts to water issues are discussed in the Watershed Report, and the record includes analysis of sensitive animal species, threatened and endangered species, and sensitive plant species.[131] As mentioned above, the Forest Service also considered the Project's effect on Management Indicator Species. Furthermore, the EA discusses the impact of livestock grazing in its "Range Resources" and "Aquatics Resources" sections, respectively.[132] Based on the review of the record in this case, the court finds that the Forest Service's analysis of the

cumulative impacts of the Project was not arbitrary or capricious and that it enabled the agency to make a reasoned decision.

### D. The Forest Service Considered Adequate Alternatives

■■■■ UEC finally argues that the Forest Service had a duty to consider a range of alternatives, but considered only two: no action and proposed action. The law provides that the determination of which alternatives should be studied in detail "is a matter left to the agency's discretion." [133] Furthermore, the "agency's discussion of alternatives must be 'bounded by some notion of feasibility.' " [134] The reasonable range of alternatives is determined by the purpose of the proposed action.[135] "It must also be noted that the agency's duty to consider alternatives in preparing an EA is a lower duty than the duty to consider alternatives in preparing an EIS." [136]

■■■ Here the Project had two purposes: a primary purpose of reducing the overall stand densities of stands at highest risk for beetle infection and a secondary purpose of providing forest products to the local timber industry.[137] In preparing an EA, an agency need "set forth only those alternatives necessary to permit a reasoned choice." [138] UEC's brief suggests

*Agriculture,* 817 F.2d 609, 623 (10th Cir. 1987)).

**128.** 42 U.S.C. § 4332(2)(C).

**129.** *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 492 (9th Cir.1987).

**130.** *See* AR, Vol. 1 at 000065, 82–84, and 90–92.

**131.** *Id.* at 000716–18, 740–41, 75–52, and 760–66.

**132.** *See* AR, Vol. 1 at 000092, 95–96; *see also* Specialists Report, AR, Vol. 1 at 000397–403.

**133.** *See Southern Utah Wilderness Alliance v. Dabney,* 7 F.Supp.2d 1205, 1213 (D.Utah 1998).

**134.** *Muckleshoot v. United States Forest Service,* 177 F.3d 800, 814 (9th Cir.1999) (quotations and citations omitted).

**135.** *See Citizens Against Burlington v. Busey,* 938 F.2d 190, 195–96 (D.C.Cir.1991).

**136.** *Jackson Hole Conservation Alliance v. Babbitt,* 96 F.Supp.2d 1288, 1298 (D.Wy. 2000) (comparing 40 C.F.R. § 1508.9(b) and 40 C.F.R. § 1502.14).

**137.** *See* AR, Vol. 1 at 000044.

**138.** *Cf. Headwaters, Inc. v. Bureau of Land Mgmt.,* 914 F.2d 1174, 1180 (9th Cir.1990) (discussing law as applied to preparation of EIS).

that if the Forest Service better understood species like the woodpecker (which apparently feed on beetle larvae and increase in population in response to beetle outbreaks),[139] "the Forest Service *might* be able to manage the forest so that the beetles are kept in check by natural predators."[140] UEC's suggestion is highly speculative. The record shows that the Forest Service considered the woodpecker as an animal that could contribute to beetle control, but concluded that the bird had not done so to a sufficient degree, despite increasing spruce beetle activity.[141] Therefore, the court agrees with the Forest Service that an alternative proposing "no timber harvest" would not meet the primary or secondary purpose of the project. UEC has not proven that the Project's stated purposes are too narrowly defined. Therefore, the court concludes that there is a rational basis for the Forest Service's consideration of alternatives and the Forest Service did not fail to consider a reasonable range of alternatives under NEPA.

### CONCLUSION

For the reasons stated, the court GRANTS defendant's motion to dismiss UEC's petition for review of agency action [19-2] and GRANTS defendant's motion to affirm the Forest Service's Decision Notice and Finding of No Significant Impact for the Thousand Lakes Mountain Community Forestry Initiative Project [19-1]. Accordingly, the clerk of the court is directed to close this case.

SO ORDERED.

---

**139.** *See* AR, Vol. 1 at 000074.

**140.** Plaintiff's Brief at 49 (emphasis added).

**141.** *See* AR, Vol. 1 at 000073.