**COLORADO WILD, Plaintiff,**

v.

**UNITED STATES FOREST SERVICE, and Mark W. Stiles, San Juan National Forest Supervisor, Defendants.**

**No. CIV.A.03–Z–2592 PAC.**

United States District Court, D. Colorado.

Jan. 30, 2004.

Geoffrey Brent Hickcox, Kenna & Hickcox, P.C., Durango, CO, Jeffrey C. Parsons, Atty. at Law, Boulder, CO, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

WEINSHIENK, Senior District Judge.

Jurisdiction in this matter before the Court is based on the presence of a federal question, with the United States as a defendant.[1] On January 27, 2004, the Court held a hearing on Plaintiff Colorado Wild's Motion For A Preliminary Injunction seeking judicial review of Defendants' Record of Decision concerning the Missionary Ridge Burned Area Timber Salvage Project in Colorado's San Juan National Forest. An initial motion for a temporary restraining order has been withdrawn. The Court heard the testimony of witnesses and the statements and arguments of counsel, and has fully considered the record, briefs, and all exhibits. For the

---

1. 28 U.S.C. §§ 1331, 1346.

reasons stated below, the Court grants the Motion For A Preliminary Injunction.

## Background

Plaintiff, a non-profit corporation, filed a Complaint For Declaratory And Injunctive Relief challenging the approval of a timber salvage project in Colorado's San Juan National Forest (SJNF) known as the Missionary Ridge Burned Timber Salvage Project (Project). Defendants (Forest Service) issued a draft environmental impact statement, a final environmental impact statement (FEIS), and a Record of Decision (ROD) in 2003. Plaintiff then filed its complaint pursuant to the Administrative Procedures Act (APA).[2]

Plaintiff alleges violations of the National Forest Management Act (NFMA)[3] and the National Environmental Policy Act (NEPA).[4] Plaintiff seeks a declaration that approval of the project violated NFMA, NEPA, and their implementing regulations, and requests an injunction prohibiting the implementation of the Project until the Forest Service complies fully with the requirements of NFMA, NEPA, and their implementing regulations.

## Discussion

### A. Preliminary Injunction Requirements

■ To obtain a preliminary injunction, the moving party must satisfy four requirements: (1) a substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.[5]

### B. Likelihood of Success on the Merits

#### 1. Standard of Review

■ This Court reviews claims that the Forest Service violated either NFMA or NEPA under Section 706 of the APA.[6] Based on the record, the Court must determine whether the ROD and the FEIS issued for the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, or without observance of procedure required by law.[7] "The APA's arbitrary and capricious standard is a deferential one; administrative determinations may be set aside only for substantial procedural or substantive reasons, and the court cannot substitute its judgment for that of the agency."[8] "[A]n agency's interpretation of its own regulations, including its procedural rules, is entitled to great deference."[9] Under this standard, the

---

2. 5 U.S.C. §§ 701–706 (1996).

3. 16 U.S.C. §§ 1600–1614 (2000).

4. 42 U.S.C. §§ 4321–4370f (2003).

5. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). Because the Court concludes that requirements 2, 3, and 4 tip in favor of Plaintiff, but not strongly, the Court declines to apply the Tenth Circuit's lesser standard on the merits as set forth in *Walmer v. United States Dept. of Defense*, 52 F.3d 851, 854 (10th Cir.1995). Also, the Court declines to apply the heightened standard set forth in *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir.2001), because Plaintiff seeks only to ensure that logging proceeds in compliance with applicable laws and regulations.

6. *Colorado Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir.1999).

7. 5 U.S.C. § 706(2)(A), (D) (1996).

8. *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir.2002).

9. *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 738 (10th Cir.1993).

Court may reject an agency's interpretation of its own regulations when the interpretation is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." [10]

### 2. Forest Service's Obligation to Monitor Management Indicator Species

█ Plaintiff asserts that the Forest Service failed to comply with applicable law and regulations by failing to conduct a quantitative analysis of population trends of certain management indicator species (MIS). The six MIS at issue here are the green-tailed towhee, hairy woodpecker, Merriam's turkey, mountain bluebird, Abert's squirrel, and the American marten. The Forest Service asserts that applicable regulations [11] do not require it to conduct a quantitative analysis of actual and trend populations of MIS but that it may rely on a mixture of population and habitat analyses, and that it properly did so in this case.

█ Based upon the relevant statutes, regulations, and case law, the Court determines, as a preliminary matter, that unless it is technically infeasible and not cost-effective, the Forest Service has an obligation to collect and analyze quantitative population data, both actual and trend, for MIS.[12] Further, this requirement applies at both the forest-plan level and the project level.[13] Section 219.19(a)(2) of the regulations states that "[p]lanning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator species." [14] Section 219.19(a)(6) requires that "[p]opulation trends of the management indicator species will be monitored and relationships to habitat changes determined." [15] Section 219.26 mandates that, in planning for forest diversity of animal communities, "[i]nventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition." [16] "[T]aken together, [these] regulations require the Forest Service to gather

---

10. *Id.*

11. 36 C.F.R. §§ 219.19 and 219.26 (1999). The Court notes that the 1982 version of the regulations, as last published in the 1999 edition of the Code of Federal Regulations, applies to the NFMA matters at issue here because the Forest Plan and the Project were both developed under the 1982 rules.

12. *See Sierra Club v. Martin,* 168 F.3d 1, 6–7 (11th Cir.1999) (concluding that these regulations require collection of quantitative population data); *Inland Empire Public Lands Council v. United States Forest Serv.,* 88 F.3d 754, 763 n. 12 (9th Cir.1996) (where data for the MIS were not available because the species was reclusive, the Forest Service properly used habitat trend data rather than acquiring actual population counts because there was no technically reliable and cost-effective method of counting individual members of the species); *Utah Envtl. Congress v. Zieroth,* 190 F.Supp.2d 1265, 1271 (D.Utah 2002) (Forest Service failed to comply with regula-

tions where failure to collect data was not due to any inability to collect it, but to a Forest Service decision not to collect it); *Forest Guardians v. United States Forest Service,* 180 F.Supp.2d 1273, 1282 (D.N.M.2001) (Forest Service obligated as a matter of law to acquire and analyze population data (both actual and trend) for the relevant MIS). *Accord, Dombeck,* 185 F.3d at 1170 n. 9 (encouraging Forest Service to analyze the viability of species' population in terms of actual population size, trends, dynamics, and distribution when such data is available).

13. *See Martin,* 168 F.3d at 6 n. 9 (Section 219.19 applies at project level), *citing Inland Empire,* 88 F.3d at 760 n. 6. *See also Zieroth,* 190 F.Supp.2d at 1270 n. 1 (same).

14. 36 C.F.R. § 219.19(a)(2) (1999).

15. 36 C.F.R. § 219.19(a)(6) (1999).

16. 36 C.F.R. § 219.26 (1999).

quantitative data on MIS and use it to measure the impact of habitat changes on the Forest's diversity. To read the regulations otherwise would be to render one or the other meaningless as well as to disregard the regulations' directive that population trends of the MIS be monitored and that inventory data be gathered in order to monitor the effects of the Forest Plan." [17] It is implicit in these regulations that actual and trend population data must be collected before the Forest Service can evaluate it and monitor population trends,[18] unless, of course, the Forest Service articulates a valid reason for the failure to collect the data such as technical or practical inability.[19] This is not the case here, however. Finally, in the FEIS, the Forest Service itself stated that it "is obligated by the [NFMA] implementing regulations to acquire and analyze population (both actual and trend) data of its selected MIS." [20]

The record is replete with evidence that the Forest Service lacks the required data. In the FEIS the Forest Service admits that it lacks quantitative data to determine population trend on the SJNF of the Abert's squirrel, green-tailed towhee, hairy woodpecker, Merriam's turkey, and mountain bluebird.[21] In addition, the Forest Service states that it is "currently in the process of establishing a monitoring program" for the Abert's squirrel.[22] In a forest-wide MIS assessment, a separate document dated July 2002 to which the FEIS refers for population data, the Forest Service admits that "[t]here is no specific data on Abert's squirrel population trend for the SJNF." [23] As to the American marten, the Forest Service admits that it "is currently in the process of searching for acceptable protocols to establish a monitoring program for the species." [24] The species assessment for the marten states that "[n]o Forestwide or Ranger District surveys have been conducted for the marten on the SJNF.... There is currently no quantitative information on population densities at this time." [25] The Merriam's turkey species assessment states that there is "no quantitative information available on numbers of wild turkeys in the state or on the SJNF." [26]

These statements indicate that the Forest Service has not complied with the requirements of the regulations to collect population trend data for these six MIS. Although the Forest Service points to some quantitative population data that has been collected for three of the bird species, the FEIS and the individual species' assessments note the particular shortcomings of these studies.[27] In any event,

17. *Martin,* 168 F.3d at 7.

18. *Id.* at 6.

19. *Inland Empire,* 88 F.3d at 763 n. 12 (9th Cir.1996); *Zieroth,* 190 F.Supp.2d at 1271; *Forest Guardians,* 180 F.Supp.2d at 1282 n. 10.

20. FEIS at 3–70.

21. *Id.* at 3–77 (Abert's squirrel), 3–84 (green-tailed towhee), 3–88 (hairy woodpecker), 3–90 (Merriam's turkey), and 3–91 (mountain bluebird).

22. *Id.* at 3–77.

23. Abert's Squirrel Species Assessment at 8 (Pl.'s Ex. H).

24. FEIS at 3–79.

25. American Marten Species Assessment at 8 (Pl.'s Ex. I).

26. Merriam's Wild Turkey Species Assessment at 3 (Defs.' Ex. 4).

27. *See* FEIS at 3–84, 3–88, 3–91 (breeding bird surveys cannot accurately track green-tailed towhee, hairy woodpecker, or mountain bluebird population trends at anything other than gross geographic scales over long time periods); Mountain Bluebird Species Assess-

these data are not population trend data for the SJNF or the Project as required by the regulations. The Forest. Service also Identifies a study containing American marten population data collected between 1992 and 1995. However, the purpose of this study was to obtain evidence of wolverines, and this portion of the species assessment specifically notes that no "Forest-wide or district surveys have been conducted for the marten" on the SJNF.[28] The Court finds that the data contained in this study is not the population trend data required by the regulations. Accordingly, the Court concludes, as a preliminary matter, that the Forest Service's approval of the Project without trend population data for the MIS is contrary to the governing regulations, and therefore Plaintiff is substantially likely to succeed on the merits of its first NFMA claim.[29]

### 3. Plaintiff's Other Claims

Because the Court determines, as a preliminary matter, that Plaintiff is substantially likely to prevail on the merits of its NFMA claim concerning MIS, Plaintiff will receive the relief it seeks. Accordingly, the Court need not determine Plaintiff's likelihood of success on the merits of Plaintiff's other NFMA claim or its NEPA claim.

### C. Irreparable Injury

■ The Court concludes, as a preliminary matter, that Plaintiff will suffer irrep-

arable injury unless the injunction issues. Biological integrity of the area is at risk due to the Forest Service's failure to collect population trend data for the MIS. Plaintiff has shown that this environmental harm will result in irreparable injury to the specific environmental interests of Plaintiff and its members, as exemplified in the declaration of Plaintiff's executive director, Jeff Berman.[30]

### D. Balance of Hardships

■ The Court concludes, as a preliminary matter, that the threatened injury to Plaintiff outweighs whatever damage the proposed injunction may cause the Forest Service. Plaintiff's injury is irreparable while the Forest Service's injury is primarily economic. Any incidental non-economic harms, such as an inability to implement fire abatement and beetle treatment, do not outweigh the harm to Plaintiff resulting from a violation of NFMA because the Forest Service has not identified the Project area as a priority for fire abatement or beetle treatment.

### E. Public Interest

■ The Court concludes, as a preliminary matter, that the injunction, if issued, would not be adverse to the public interest. There is an overriding public interest in the preservation of biological integrity

---

ment at 13 (Defs.' Ex. 5) (none of the population trend studies identified provide "definitive, quantitative data on bluebird population trends that are specific only to the SJNF, and we provide no additional supplemental population trend data specific to the Forest"); Hairy Woodpecker Species Assessment at 4 (Defs.' Ex. 3) (Monitoring Colorado's Birds project reports do not contain "data specific to the SJNF"); Green-tailed Towhee Species Assessment at 4 (recent Monitoring Colorado's Birds project reports do not contain data specific to the SJNF) (Defs.' Ex. 2).

**28.** American Marten Species Assessment at 5 (Defs.' Ex. 7).

**29.** The Court notes, without deciding, that it appears the Forest Service has failed to collect actual population data for some MIS.

**30.** *See Davis v. Mineta,* 302 F.3d 1104, 1115 (10th Cir.2002) (plaintiff must make specific showing that environmental harm results in irreparable injury to plaintiff's specific interests).

and the undeveloped character of the Project area that outweighs public or private economic loss in this case. As indicated above, the Forest Service has not identified the Project area as a priority for fire abatement or beetle treatment. Therefore, any loss of the incidental benefits of fire abatement or beetle treatment does not outweigh the overriding public interest in preservation of biological integrity and the undeveloped character of the area pending compliance with NFMA.

## F. Bond

■ Plaintiff is a non-profit environmental group and requests the Court to waive the security required by Fed. R.Civ.P. 65(c). Plaintiff's executive director has submitted a declaration that Plaintiff is unable to post more than a nominal bond. It would frustrate the purpose of NFMA to require a bond in this case, where Plaintiff has shown a likelihood of success on the merits, and a bond requirement effectively could preclude Plaintiff's request for review of administrative action.[31] Accordingly, the Court will waive the security requirement.

## Conclusion

For the foregoing reasons, the Court concludes, as a preliminary matter, that Plaintiff is likely to succeed on the merits of its first NFMA claim concerning MIS. The Court need not address Plaintiff's likelihood of success on the merits of Plaintiff's other NFMA claim or its NEPA claim. The Court also concludes that, as a preliminary matter, Plaintiff will sustain irreparable injury if an injunction does not issue, the balance of hardships favors Plaintiff, and an injunction is not adverse to the public interest. Accordingly, it is

ORDERED that Plaintiff's Motion For Preliminary Injunction is granted. It is

FURTHER ORDERED that Plaintiff's Motion For Temporary Restraining Order is withdrawn. It is

FURTHER ORDERED that Defendants are enjoined preliminarily from implementing the Missionary Ridge Burned Timber Salvage Project pending compliance with the MIS population monitoring requirement. It is

FURTHER ORDERED that Plaintiff is not required to post security. It is

FURTHER ORDERED that, if necessary, Plaintiff shall submit a proposed order within 10 days to provide further details on the scope of the preliminary injunction.

---

31. *See People ex rel. Van De Kamp v. Tahoe Regional Plan.*, 766 F.2d 1319, 1325–26 (9th Cir.) (waiving bond requirement for non-profit environmental group where plaintiff likely to succeed on merits and requiring security would effectively deny access to judicial review), *amended on other grounds*, 775 F.2d 998 (9th Cir.1985). *See also Utahns for Better Transp. v. United States Dept. of Transp.*, 2001 WL 1739458 at *5 (10th Cir.2001) (bond must not be set so high as to deny moving party its right to judicial review of its claims (*citing Van De Kamp*)); *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir.1987) (suggesting that district court may comply with Fed.R.Civ.P. 65(c) by giving adequate consideration to request for bond).