PAUL G. BYRON, UNITED STATES DISTRICT JUDGE
Plaintiff Sierra Club, Inc. challenges agency actions taken by the St. John's River Water Management and the Army Corps of Engineers relating to the Farmton Mitigation Bank, one of the largest federal wetland mitigation banks in the United States. Plaintiff contends that, by permitting portions of the mitigation bank to be converted to mixed use development, Defendants violated the Clean Water Act's Compensatory Mitigation Rule, the Administrative Procedure Act, and the National Environmental Policy Act. (Doc. 73). Before the Court are the following cross-motions for summary judgment:
1. Plaintiff's Motion for Summary Judgment (Docs. 140, 141);
2. Federal Defendants' Cross-Motion for Summary Judgment (Doc. 151); and
3. Intervenor's Cross Motion for Summary Judgment (Doc. 150);
The parties filed various responses and replies to the cross-motions for summary judgment. (Docs. 145, 149, 151, 155, 156, 157, and 158). Upon consideration of the records as cited by the parties in their respective briefs, the Court finds that judgment in favor of Defendants is due for all Counts.
I. BACKGROUND
This lawsuit arises out of agency decisions made by the St. Johns River Water Management District ("SJRWMD ") and the Army Corps of Engineers (the "ACOE ")[1] in their management of the *1301 Farmton Mitigation Bank ("FMB " or the "Bank "). (Doc. 123). The FMB is wholly owned by Intervenor Miami Corporation ("Miami Corp "). At its inception, the FMB contained more than 24,000 acres of wetland and upland habitat, making it one of the largest federal wetland mitigation banks in the country.[2] "The importance of this [ ] bank is that it will preserve in perpetuity a very large amount of habitat ... [and insulate it from] residential, commercial or agricultural development ... [by creating] [s]ufficient legal interest and financial responsibility [ ] to ensure perpetual protection." (AR_00089-90).
Because of its large size, the FMB was segmented into three distinct but hydrologically connected sites, with mitigation activities implemented on the sites in phases. (AR_00045-48). Once all mitigation tasks for a particular phase were completed, mitigation credits for that portion of the Bank were generated and available for purchase. (AR_07564). As mitigation credits were sold pursuant to the Clean Water Act's ("CWA ") section 404 compensatory mitigation program, conservation easements were recorded on the corresponding parcels of land in the FMB. The SJRWMD is the grantee of all the conservation easements recorded on the FMB. (AR_00057). As of March 2017, approximately 4,338.92 mitigation credits have been generated and released for sale. (AR_07578). Of those available credits, only 363.728 have been withdrawn to mitigate for permitted impacts to waters of the United States. (Id. ). The ACOE postures that the low credit sales at the FMB "may be a result of the [ ] economic downturn [from 2007 through 2009] as well as the availability of mitigation credits at other Corps-approved mitigation banks with overlapping mitigation service areas." (AR_07564).
The operation of the FMB is controlled by the FMB Mitigation Bank Instrument ("MBI ").[3] (AR_0043-00227). The MBI was originally signed by the ACOE in 2000, and contained the mitigation plan for the Bank. Due to the large size of FMB, the number of mitigation credits the market could support was uncertain; thus, the MBI included a mechanism for reducing the size of the Bank if needed:
The fact that Farmton Mitigation Bank is such a large bank, and is expected to operate over a very long time, places a level of uncertainty that all credits will eventually be sold. If the market demand for credits is inadequate for any reason, the Miami Corporation reserves the right to remove unused portions of *1302 the bank (those areas without Conservation Easements in place) from the bank.
(AR_00048).
In accordance with this mechanism, Miami Corp requested a modification of the MBI in 2010 (the "MBI Modification "). The MBI modification sought to withdraw 860.22 acres (374.77 acres of wetlands and 110.68 acres of uplands) from the boundaries of the FMB and include them in the in the surrounding Farmton Local Plan-a long-term development plan approved by both Volusia and Brevard Counties. (AR_00679-00708; AR_00804-008013). Miami Corp requested the MBI Modification due to the decrease in the demand for credits from 2007 through 2009. (AR_07565). The land subject to removal is considered an "unused or inactive portion of the FMB"-meaning it had not been used to mitigate for any impacts to water of the United States, and thus had not been preserved by a recorded conservation easement. (AR_07564). Following a period of public comment and interagency coordination, the ACOE "determined that the proposed modification to ... FMB will not impact the ability of the site to continue to provide appropriate compensatory mitigation for future impacts to waters of the United States within the approved service area." (AR_04128-29). Therefore, the ACOE approved the proposed modification. (AR_04129).
Subsequent to the ACOE's approval, Plaintiff Sierra Club, Inc. ("Sierra Club ") initiated this action. (Doc. 1). On January 26, 2016, the ACOE moved to remand to allow the ACOE to conduct a more thorough environmental assessment under the National Environmental Policy Act ("NEPA "). (Doc. 96). Upon remand, the ACOE conducted a NEPA assessment and sought additional public comment through public notice. (AR_05875). The ACOE also coordinated with the State Historic Preservation Officer (AR_06191), coordinated with the Interagency Review Team ("IRT "),[4] and conducted an informal consultation with the U.S. Fish and Wildlife Service (AR_07043; AR_07213). Following this coordinated assessment, the ACOE issued an Environmental Assessment and Statement of Findings ("NEPA Statement ") on March 3, 2017. (AR_07557-730). In the NEPA Statement, the ACOE affirmed its approval of the proposed MBI Modification, and found:
[T]he proposed modification to the North Bank Site of FMB will not impact the ability of the site to continue to provide appropriate compensatory mitigation for future impacts to waters of the United States within the approved service area. The modification removes only a small portion of the existing wetlands (374.77 out of 13,159.52) and 110 acres of uplands from an area that has not provided compensation for impacts to waters of the United States and has not been preserved by a conservation easement. The Sponsor has provided a perpetual access easement agreement for the continued access, operation and maintenance of the hydrologic structures crossing the removal area to maintain the hydrologic connectivity of the North Bank Site. The Sponsor has agreed to the construction of wildlife crossings, if impacts to jurisdictional waters of the United States are approved which may affect wildlife utilization and connectivity of the North Bank Site. The *1303 vast majority of the vegetative structure of the North Bank Site would not be affected by the removal area due to the ongoing and perpetual maintenance of the FMB. The credit generation potential of those wetlands whose buffers were affected by the modification (i.e., reduced to less than the optimal 300-foot range) will be reduced to compensate for the loss of buffer and any potential effect from activities that might occur on those lands in the future.
(AR_07587).
With the NEPA assessment complete, the Court reopened the case on March 24, 2017. (Doc. 117). Sierra Club filed its Third Amended Complaint on May 30, 2017, alleging that (1) the ACOE violated the CWA, CWA Regulations, and the Administrative Procedures Act ("APA ") by approving the modification of the FMB MBI; (2) the SJRWMD violated the CWA and CWA Regulations by issuing permits contrary to the purpose of the FMB; and (3) the ACOE improperly applied NEPA to the FMB MBI Modification.
II. STANDARD OF REVIEW
A. Summary Judgment
To prevail on a summary judgment motion, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; see also Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." Davila v. Gladden , 777 F.3d 1198, 1203 (11th Cir. 2015) (quoting Carter v. City of Melbourne , 731 F.3d 1161, 1166 (11th Cir. 2013) (per curiam) ). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Harrison v. Culliver , 746 F.3d 1288, 1298 (11th Cir. 2014). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Brooks v. Cty. Comm'n of Jefferson Cty. , 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting Walker v. Darby , 911 F.2d 1573, 1577 (11th Cir. 1990) ).
B. Agency Review
An agency's decision-making authority is subject to review under the Administrative Procedures Act ("APA "). 5 U.S.C. § 706. Under the APA, the Court must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Sierra Club v. Van Antwerp , 526 F.3d 1353, 1360 (11th Cir. 2008) (quoting 5 U.S.C. § 706(2)(A) ). This standard does not require the agency to have taken the best or most reasonable action and does not permit the district court to review the agency's action with the benefit of hindsight. Druid Hills Civic Ass'n v. Fed. Highway Admin. , 772 F.2d 700, 708-09 (11th Cir. 1985). Rather, the agency's action need only be a rational one that it selected by following its established decision-making procedure. See id. "This standard is exceedingly deferential [to the agency's decision]." Van Antwerp , 526 F.3d at 1360.
Nevertheless, where an agency has promulgated regulations and procedures for implementing a statutory scheme, the agency must "scrupulously follow" those regulations and procedures.
*1304 Sierra Club v. Martin , 168 F.3d 1, 4 (11th Cir. 1999). An agency decision issued without adherence to its own regulations must be overturned as arbitrary and capricious. Sierra Club v. U.S. Army Corps of Eng'rs , 464 F.Supp.2d 1171, 1183 (M.D. Fla. 2006), aff'd , 508 F.3d 1332 (11th Cir. 2007) (per curiam).
III. DISCUSSION
The gravamen of the Sierra Club's case is that the actions of the ACOE and the SJRWMD violate the CWA's compensatory mitigation rule. The Court thus begins its analysis with a review of this rule.
A. CWA's Compensatory Mitigation Rule
The CWA is the legal framework intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 404(b)(1) of the CWA grants the ACOE the power to issue permits for activities that impact waters of the United States. § 1344(b)(1). The rules governing the ACOE's power to issue § 404 permits are provided in related federal regulations. See 33 C.F.R. §§ 325, 332. These standards require that an applicant for a permit must address how impacts to waters of the United States will be minimized, avoided, and-where impacts are unavoidable-how they will be mitigated. 33 C.F.R. § 325.1(d)(7). Mitigation activities can be accomplished by the permittee or can be accomplished through the purchase of mitigation credits from a mitigation bank. § 332.3. The ACOE's rules and regulations related to compensatory mitigation activities are provided in 33 C.F.R. § 332 (the "Mitigation Rule "). "The goal of the rule is to ensure permanent protection of all compensatory mitigation project sites." 73 Fed. Reg. 19594.
1. Whether the ACOE Violated the CWA and CWA Regulations
The Sierra Club first argues that the ACOE did not follow its regulations and procedures under the CWA when it approved the FMB MBI Modification. (Doc. 128, p. 48) (Counts I, II).
As an initial matter, the Court notes that the Mitigation Rule allows for modifications of approved MBIs. 33 C.F.R. § 332.8(d)(2). To receive a modification, the sponsor-in this case, Miami Corp-must submit a written request for modification that is accompanied by appropriate documentation. Id. The district engineer then provides public notice of the proposed modification and allows for thirty days of public comment. § 332.8(d)(4). After receiving public comment, the district engineer makes a final decision and, if approved, the modification is signed by the appropriate parties. Id. ; see also § 332.7(c)(3) ("A significant modification of the compensatory mitigation project requires approval from the district engineer.").
These procedures were followed in this case. In fact, the Sierra Club does not contend there was anything procedurally wrong with the FMB MBI Modification process. Rather, the Sierra Club appears to argue that the MBI Modification is not consistent with certain requirements of the Mitigation Rule. For example, the Sierra Club argues that the Mitigation Rule "patently precludes modifications to the FMB that authorize removal of land from the FMB, which at a minimum alters the boundaries of the bank." (Doc. 141, p. 19) (citing 33 C.F.R. § 332.4(c)(7) ).
The Court has carefully reviewed the Mitigation Rule and the CWA, and finds nothing that would prohibit alteration of the boundaries of a mitigation bank. For support of its argument, the Sierra Club cites to 33 C.F.R. § 332.4(c)(7), which describes *1305 the requirement for a mitigation work plan:
Detailed written specifications and work descriptions for the compensatory mitigation project, including, but not limited to, the geographic boundaries of the project; construction methods, timing, and sequence; source(s) of water, including connections to existing waters and uplands; methods for establishing the desired plant community; plans to control invasive plant species; the proposed grading plan, including elevations and slopes of the substrate; soil management; and erosion control measures.
§ 332.4(c)(7). This regulation indeed requires the creation of a mitigation plan that includes the geographic boundaries of the mitigation bank. However, the Court finds nothing in this language that would prohibit the ACOE from approving a modification of those geographic boundaries if necessary to achieve an environmentally and economically viable mitigation bank.
The Sierra Club also argues that the MBI Modification is contrary to the site-protection requirements of the Mitigation Rule. (Doc. 155, p. 7). Site protection is a fundamental goal of the Mitigation Rule, which requires that "[t]he aquatic habitats, riparian areas, buffers, and uplands that comprise the overall compensatory mitigation project must be provided long-term protection through real estate instruments or other available mechanisms, as appropriate." 33 C.F.R. § 332.7(a)(1) (emphasis added). The Sierra Club interprets this language as prohibiting the ACOE from approving a modification of the FMB MBI that reduces the overall size of the FMB. (Doc. 141, p. 17).
This interpretation does not consider the large degree of discretion the drafters of the Mitigation Rule intentionally left to the district engineer in approving modifications to existing MBIs. See 33 C.F.R. § 332.7(c)(1) ("A significant modification of the compensatory mitigation project requires approval from the district engineer."). In fact, when facing public criticism that the Mitigation Rule leaves too much discretion to the district engineer, the drafters explained that "it is necessary to provide the district engineer with the authority to determine whether remediation measures are appropriate and practicable." 73 Fed. Reg. 19594, 19607. The drafters repeatedly refer to the flexibility allowed to the ACOE and the district engineer in administering mitigation activities, noting that the "rule appropriately balances the need for consistency with the need for flexibility." 73 Fed. Reg. 19594, 19609. Considering the importance the drafters placed on the flexibility of the Mitigation Rule,[5] it seems unlikely that the Rule was intended to be interpreted in such a way as to require rigid adherence to geographic boundaries of a mitigation bank that are neither economically nor environmentally viable. A more likely interpretation is that the district engineer, and the ACOE, can approve modifications to the boundaries of an approved mitigation bank, if that modification adheres to the ecological performance standards set forth in the Mitigation Rule. See 33 C.F.R. § 332.5.
The Sierra Club next argues that the Farmton Local Plan[6] was somehow "incorporated" in the MBI Modification, thereby "unleash[ing] decades of development into *1306 the FMB, with all the resulting environmental degradation ... and other manifestations of intense human presence on the landscape." (Doc. 141, p. 18). Without explaining how the MBI Modification "incorporates" the Farmton Local Plan, the Sierra Club claims that the "ACOE accepted, adopted and incorporated the Famrton Local Plan into its 2013 Updated Enabling Instrument, thereby binding the federal agency to development of the plan, regardless of the ecological consequences for the FMB." (Doc. 141, p. 20).
However, the amended MBI Modification only references the Farmton Local Plan when discussing wildlife crossings, stating: "To ensure consistency with the intent of the ACOE Mitigation bank permit and its permitted criteria, as well as the adopted Farmton Local Plan ..., wildlife crossings and other applicable tools shall be incorporated into the design of the proposed, future 'Spine Road' when and as applicable." (AR_07531-32). The Court is unable to comprehend how this one reference to the Farmton Local Plan-which requires the use of environmental safety mechanisms to ensure protection of the FMB-somehow incorporates the development plan into the FMB MBI. Without a more fully-developed and supported argument on how the Farmton Local Plan is "incorporated" into the FMB, the Sierra Club has not carried its burden on this point.
The Sierra Club cites to only one case for support of its argument that the ACOE acted arbitrarily and capriciously by approving the FMB MBI Modification. (Doc. 155, p. 12) (citing Sierra Club v. Martin , 168 F.3d 1 (11th Cir. 1999) ). In Martin , the Sierra Club sued the National Forest Service to stop the Forest Service's decision to allow timber sales in national forests in Georgia. Prior to the decision to open the forests to timbering, the Forest Service adopted a Land and Resource Management Plan, which provided rules and regulations for managing the forests. Id. at 3. Before any timber sales could occur within the forests, the management plan required the Forest Service to conduct a site-specific study to determine whether the timber operations would harm the area or any resident species. After the Forest Service determined there were no adverse impacts, it approved the timber sales. Id.
Sierra club sued under the APA, arguing that the timber sales would harm plant and animal species within the forest. The Sierra Club maintained that the Forest Service failed to collect population data required by the adopted management plan, and thus acted in violation of its own regulations. Id. The Eleventh Circuit Court of Appeals agreed, finding the Forest Service's regulations required the agency to monitor certain species to determine the effects of habitat change. Yet, despite the extensive habitat changes proposed by the timber sales, the Forest Service was unable to produce any population data for half the species in the forests, and thus was in clear violation of explicit requirements of the regulations. Id. at 7.
The facts of this case are sharply contrasted from the facts in Martin . In Martin , the Sierra Club was able to point to explicit regulations that required the Forest Service to conduct specific actions prior to approving timbering on federal lands. Because those regulations were ignored, the Eleventh Circuit found the agency's actions arbitrary and capricious. Here, conversely, the Sierra Club cannot point to a single regulation that the ACOE has violated. Instead, the Sierra Club's arguments amount to nothing more than an allegation that ACOE's actions are not consistent with the purpose of the Mitigation Rule. While it is undoubtedly true that *1307 the Mitigation Rule seeks "to ensure permanent protection of all compensatory mitigation project sites," 73 Fed. Reg. 19594, there is no explicit regulation that forbids the ACOE from modifying the geographic boundaries of a mitigation bank. Without any evidence of violation of a regulation, the Court defers to the ACOE's judgment in approving the FMB MBI Modification.
The ACOE is entitled to judgment in its favor on Counts I and II.
2. Whether the SJRWMD Violated the CWA and CWA Regulations
The Sierra Club next argues that SJRWMD violated the Mitigation Rule by granting permits that "are inconsistent with the bank's permanent site protection and sustainability" requirements. (Doc. 128, pp. 50-51) (Counts II, III). Specifically, the Sierra Club takes issue with the following actions taken by the SJRWMD: (1) the issuance of ERP Permit 4-127-765-4 allowing the removal of 1,116.35 acres from the boundaries of the FMB; (2) the issuance of a "Partial Release of Conservation Easement;" and (3) the issuance of Consumptive Use Permit No. 127579-1. (Doc. 141, pp. 8-9).
The Sierra Club brings this claim against the SJRWMD under the APA. In defense, the SJRWMD contends that the Sierra Club cannot sue the SJRWMD under the APA because the federal APA does not apply to state agencies. See Town of Portsmouth v. Lewis , 813 F.3d 54, 64 (1st Cir. 2016) (federal APA does not provide a right of action against a state agency), Doe v. Bush , 261 F.3d 1037, 1054-55 (11th Cir. 2001) (federal APA "clearly does not apply to state agencies"), Sw. Williamson Cty. Cmty. Ass'n, Inc. v. Slater , 173 F.3d 1033, 1035-36 (6th Cir. 1999) ("By its own terms, the APA does not apply to state agencies. This result is confirmed by case law."). Nonetheless, federal jurisdiction can be exerted over state agencies and officials under the doctrine of Ex Parte Young when "plaintiffs seek only prospective injunctive relief to stop ongoing violations of federal law." Friends of Everglades v. S. Fla. Water Mgmt. Dist. , 570 F.3d 1210, 1215 (11th Cir. 2009). The question of whether a federal court has "jurisdiction over a state official in an action like this one is a complex legal question," requiring an in-depth analysis of the Eleventh Amendment's grant of sovereign immunity and its applicability to the specific facts of this case. Citizens for Smart Growth v. Sec'y of Dep't of Transp. , 669 F.3d 1203, 1210 (11th Cir. 2012). The Court need not conduct such an analysis here, however, because the Sierra Club fails to establish a violation of federal law.
The Sierra Club alleges violations of the CWA and the Mitigation Rule based on SJRWMD's approval of modification the FMB permits. For instance, the SJRWMD authorized a state mitigation bank permit that modified the geographic boundaries of the FMB. That permit was issued under the state's regulatory authority.[7] There is nothing in the Mitigation Rule that can be interpreted as prohibiting a state water management district from issuing permits under state wetland regulations. On the contrary, the CWA explicitly protects states' right to regulate waters within their jurisdiction. See 33 U.S.C. § 1251(g) ("the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter").
The Sierra Club also objects to the SJRWMD's release of 200.32 feet of land *1308 from a conservation easement authorized by the FMB ERP permit. (AR_02775-80). The Sierra Club argues that the removal of this land "is antithetical to the compulsory site protection requirement of the federal [Mitigation Rule]." (Doc. 155, p. 17). The record establishes, however, that the land released by the SJRWMD was erroneously encumbered by the conservation easement. (AR_02786). Even though the Mitigation Rule requires the use of long-term protection through "real estate instruments or other available mechanisms," 33 C.F.R. § 332.7(a)(1), the Court doubts that the Rule should be interpreted as to prohibit the SJRWMD from remedying an error made in the recording of a conservation easement. In fact, Florida law authorizes a water management district "to release or amend a conservation easement when a release or amendment is necessary to correct legal errors or to conform the conservation easement with the requirements of applicable permit conditions." Fla. Admin. Code 40C-1.1101(1)(f) (2010).[8] Thus, the SJRWMD's release of 200 feet of land erroneously included in a conservation easement, authorized by state law, does not run afoul of the Mitigation Rule or the CWA.
Lastly, the Sierra Club takes aim at the SJRWMD's issuance of a Consumptive Use Permit, authorizing the pumping of groundwater from the FMB for consumptive use. (Doc. 73-17). The Sierra Club contends that this permit is incompatible with the Mitigation Rule's requirement for "assurance of sufficient water rights to support the long-term sustainability of the mitigation bank." 33 C.F.R. § 332.8(d)(vii)(B).
The Sierra Club points to no data, no expert testimony, nor any other evidence that suggests that the water rights issued in the Consumptive Use Permit somehow deprive the mitigation bank of long-term sustainability. Conversely, the record establishes that prior to the issuance of the Consumptive Use Permit, the SJRWMD reviewed a detailed geotechnical study of the drawdown impacts projected to occur on surface waters within the FMB because of the proposed groundwater withdrawals. The resulting report assures that "[w]etlands have been monitored since at least 2009, and have not shown any signs of adverse drawdown impact." (AR_05327). The Sierra Club does not assert a challenge to the qualifications, assumptions, science, or data used in reaching this conclusion, and likewise fails to provide the Court with any counter-evidence that suggests a different outcome.
Moreover, the CUP issued to Farmton Water Resources, LLC, (a nonparty to this action) is subject to a Subordination Agreement, which requires the water rights issued to Farmton Water Resources, LLC, be subordinate to the conservation easements recorded on the FMB. (AR_01969). The Sierra Club fails to explain how this agreement does not sufficiently protect the water needs of the FMB. The Court thus finds that the Sierra Club has not carried its burden in establishing the Consumptive Use Permit issued to Farmton Water Resources, LLC, violates the Mitigation Rule or the CWA.
The SJRWMD is accordingly entitled to judgment in its favor on Counts II and III.
B. National Environmental Protection Act (NEPA)
In Count IV of the Third Amended Complaint, the Sierra Club alleges that the ACOE incorrectly applied NEPA in its Environmental Assessment conducted in 2017. (AR_07557-730). The Sierra Club maintains that the ACOE's NEPA analysis *1309 was improper because NEPA applies only to discretionary federal actions. According to the Sierra Club, the Mitigation Rule prohibits the ACOE from modifying the FMB and the resulting removal of land was a nondiscretionary action not subject to NEPA requirements. (Doc. 141, p. 29).[9]
This argument, however, is in direct conflict with the Council for Environmental Quality regulations that authorize preparation of NEPA environmental assessments: "Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decision-making." 40 C.F.R. § 1501.3 (emphasis added). The ACOE's decision to prepare an environmental assessment, even if not required to do so, is accordingly not in violation of NEPA.
Other than citing to one case, South Dakota v. Andrus , 614 F.2d 1190, (11th Cir. 1980), the Sierra Club provides no support for its claim under Count IV. To prevail on a summary judgment motion, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Sierra Club fails to carry this burden on Count IV.
The ACOE is thus entitled to judgment in its favor on Count IV.
IV. CONCLUSION
Having found no actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, the Court defers to Defendants' judgment in their management of the Farmton Mitigation Bank.
Accordingly, it is ORDERED AND ADJUDGED that:
1. Plaintiff's Motion for Summary Judgment (Doc. 140) is DENIED .
2. Federal Defendant's Cross-Motion for Summary Judgment (Doc. 151) and Intervenor's Cross-Motion for Summary Judgment (Doc. 150) are GRANTED .
3. The Clerk of Court is DIRECTED to enter judgment in favor of Defendants and against Plaintiff on all Counts, and to thereafter close the file.
DONE AND ORDERED in Orlando, Florida, on August 13, 2018.

The Complaint names the SJRWMD, the ACOE, members of the SJRWMD Governing Board in their official capacities, and the Chief Engineer of the Jacksonville District of the ACOE, as Defendants (collectively, "Defendants ").

A mitigation bank is defined as "a site, or suite of sites, where resources ... are restored, established, enhanced, and/or preserved for the purpose of providing compensatory mitigation for impacts [to waters of the United States] authorized by [ACOE] permits." 33 C.F.R. 332.2. A mitigation bank sells mitigation "credits" to permittees who are obligated under an ACOE permit to provide for compensatory mitigation for impacts to waters of the United States. Id. Once credits are sold, the permittee's obligations are transferred to the mitigation bank "sponsor." Id. A "sponsor" is "any public or private entity responsible for establishing, and in most circumstances, operating a mitigation bank." Id. In this case, Maimi Corp is FMB's sponsor.

Federal rules require "[a]ll mitigation banks [ ] to have a banking instrument as documentation of agency concurrence on the objectives and administration of the bank. The banking instrument should describe in detail the physical and legal characteristics of the bank, and how the bank will be established and operated." 60 Fed. Reg 58605,02 (C)(2). A mitigation bank instrument is a "legal document for the establishment, operation, and use of a mitigation bank. 33. C.F.R. 332.2.

An Interagency Review Team is a panel established by the ACOE to review documentation for the establishment and management of federal mitigation banks, and includes the SJRWMD, the U.S. Environmental Protection Agency, the U.S. Fish and Wildlife Service, the Natural Resource Conservation Service, and other interested public agencies. 33 C.F.R. § 332.8(b).

In responding to public comments on the then-proposed Mitigation Rule, the ACOE referenced the flexibility required for the administration of the Rule over sixty times. 73 Fed. Reg. 19594-01passim .

The Farmton Local Plan is a large-scale development plan that has been incorporated into Volusia County's Comprehensive Plan. Volusia Cty., Fla. Ordinance 2009-34.

The state of Florida implements its own regulations of wetlands under the state Environmental Resource Permit ("ERP ") program. Fla. Stat. § 373.4131. The Florida ERP program operates in addition to the federal program under the Clean Water Act.

Although this regulation has since been repealed, it was in effect at the time the SJRWMD released the partial conservation easement.

The Court notes that the Sierra Club's NEPA allegations in the Third Amended Complaint are contrary to its NEPA allegations in its Second Amended Complaint. (Compare Doc. 128 with Doc. 73). In the Second Amended Complaint, the Sierra Club argued that the ACOE "failed to conduct any environmental impact analysis pursuant to NEPA in connection with [the MBI Modification]." (Doc. 73 ¶ 82). Now, after staying this case for many months for no other purpose than to allow the ACOE to prepare a NEPA analysis, the Sierra Club objects to the very action that it once asked for.